## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "*Agreement*") is entered into effective as of, although not necessarily on, the ___ day of _____ 2020, between CSMS, LLC, a Texas limited liability company ("*Buyer*"), and Eveready Services, Inc., a Texas corporation ("*Seller*").

## RECITALS

A.     Seller is engaged in the business of moving and storage for high-end clients (the "*Business*").

B.     On January 23, 2020 (the "*Petition Date*"), Seller filed a voluntary petition for relief commencing a case (the "*Chapter 11 Case*") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division ("*Bankruptcy Court*").

C.     Buyer and Seller have reached an understanding pursuant to which Buyer shall acquire the Assets (as defined in Section 1.1 below), which represent substantially all of the assets of the Business other than the Excluded Assets (as defined in Section 1.5 below), subject to the terms and conditions of this Agreement.

D.     Each party hereto desires to set forth certain representations and covenants, and to establish certain closing conditions, made to induce the other to execute and deliver this Agreement and to consummate the transactions contemplated hereby, all in the manner and subject to the terms and conditions set forth herein and in accordance with Sections 105, 363 and 365 of the Bankruptcy Code.

## TERMS AND PROVISIONS

In consideration of the premises and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, Seller and Buyer hereby agree as follows:

## ARTICLE 1
## TERMS OF THE TRANSACTION

1.1     Assets to be Transferred; License.  At the Closing, and subject to the Sale Order (as defined in Section 4.2 below), Seller shall sell, assign, transfer, deliver, and convey to Buyer, and Buyer shall purchase from Seller, all assets and properties of every kind, character and description, whether tangible, intangible, real, personal or mixed, and wherever located, which are owned by Seller or in which Seller has any right, title or interest, and which are used or held for use by Seller in the conduct of the

Business as the same shall exist on the Closing Date, including without limitation the following:

      (a)    All tangible personal property, including trucks and other vehicles, forklifts, equipment, supplies, machinery, equipment, inventories, parts, furniture, computers and related hardware, office furnishings, storage racks, tools, and abandoned property, in each case wherever located;

      (b)    All trademarks, service marks, trade dress, logos, trade names and corporate names, including the name "Eveready" and all derivations of and goodwill associated with each of the foregoing; all copyrightable works and copyrights; all trade secrets and confidential business information; all information regarding Seller's past, current and prospective customers (including any and all lists thereof (with all contact information available to Seller), purchase history, correspondence, complaints, and all other data, reports, and information kept or maintained by or on behalf of Seller); all telephone and fax numbers, telephone directory listings, email addresses, and website domains; all computer software (whether owned or licensed) and other proprietary rights; and all copies and tangible embodiments (in whatever form or medium) of any of the foregoing, as applicable, associated goodwill, licenses and sublicenses, and rights to protection of interests under any federal, state, or local law, rule, regulation, order, writ, injunction, ruling, or judgment, each as amended and in effect, now or in the future;

      (c)    All contracts, leases and other agreements to which Seller is a party, whether or not reduced to writing, but only if and to the extent (i) the contract, lease or other agreement is assignable and (ii) Seller has assumed such contract, lease or other agreement in connection with the Chapter 11 Case;

      (d)    All accounts receivable and other amounts due or to become due to Seller on or after the Closing Date, whether or not invoiced and whether or not due and payable as of the Closing Date;

      (e)    All causes of action, rights of recovery, rights of set off and rights of recoupment and all other rights or claims against third parties related to any Asset;

      (f)    All permits, registrations, licenses, or similar rights used by or in connection with the Business, to the extent transferable;

      (g)    All books, records, ledgers, files, documents, correspondence, lists, plats, plans, drawings and specifications, creative materials, advertising and promotional materials, studies, reports and other printed or written materials including maintenance and asset records whether in written or electronic form,

other than employment records that may not be transferred pursuant to applicable law; and

(h)    All other assets of Seller listed on <u>Exhibit 1.1</u>, to the extent not described above;

(all such assets and properties, collectively, the "*Assets*"), and excluding only the Excluded Assets, if any (as defined in <u>Section 1.5</u> below).

Notwithstanding anything to the contrary, Seller shall not be obligated to sell, nor shall Buyer be obligated to purchase, any Asset that, at the Closing, Seller does not own and have the right to sell under the terms of the Sale Order or otherwise.

1.2    <u>Purchase Price Amount and Payment</u>.  The purchase price of the Assets is $90,000.00 (the "*Purchase Price*").  The Purchase Price is payable as follows:

(a)    Simultaneously with the execution of this Agreement by both parties, Buyer shall deposit the sum of $10,000.00 as earnest money (the "*Earnest Money*") with the law firm of Scheef & Stone, LLP (the "*Law Firm*").  The Law Firm shall hold the Earnest Money in an escrow capacity in the firm's IOLTA Trust Account for the benefit of the parties and shall disburse the Earnest Money only in accordance with <u>Section 8.2</u> below.  If, in the good faith opinion of the Law Firm, there is any dispute or uncertainty regarding entitlement to the Earnest Money, the Law Firm is authorized to tender the Earnest Money to the registry of a court having jurisdiction to determine the proper disposition of the Earnest Money.

(b)    Buyer shall pay to Seller $80,000.00 (*i.e.*, the Purchase Price minus the Earnest Money) in cash at the Closing (as defined in <u>Section 1.3</u> below) by wire transfer or bank cashier's check payable to the order of Seller.

1.3    <u>Closing</u>.  The closing of the transactions contemplated hereby (the "*Closing*") shall take place (a) at the offices of Scheef & Stone, LLP, 500 North Akard, Suite 2700, Dallas, Texas 75201, at 9:00 a.m., local time, on the first business day following the day the Sale Order is issued, or (b) at such other time or place or on such other date as the parties hereto shall agree (the "*Closing Date*").

1.4    <u>Instruments of Conveyance</u>.  Subject to the Sale Order, at the Closing Seller shall execute and deliver, or cause to be executed and delivered, to Buyer all such bills of sale, certificates of title, and other documents or instruments of assignment, transfer or conveyance, dated the Closing Date, as Buyer shall reasonably deem necessary or appropriate to vest in or confirm to Buyer good and marketable title to the Assets, free and clear of all Encumbrances (as defined in <u>Section 2.2</u> below) other than the Permitted Encumbrances (as defined in <u>Section 2.7</u> below), and all other claims and interests in the Assets in accordance with Section 363 or other portions of the

Bankruptcy Code.  Among other documents, Seller shall deliver to Buyer at Closing a detailed list of items held in storage by Seller on behalf of its customers.

1.5    Excluded Assets.    Notwithstanding any provision contained in this Agreement to the contrary, the assets and properties of Seller set forth on Exhibit 1.5, attached hereto (the "*Excluded Assets*"), if any, shall be excluded from the Assets to be transferred to Buyer hereunder.

1.6    No Liabilities Assumed by Buyer.  Buyer shall not assume or take title to the Assets subject to, or in any way be liable or responsible for, any liabilities or obligations of Seller (whether or not referred to in any Exhibit hereto), it being expressly acknowledged that it is the intention of the parties hereto that all liabilities and obligations that Seller now has or may have in the future (whether accrued, absolute, contingent, unliquidated or otherwise, whether or not known to Seller, and whether due or to become due), shall be and remain the liabilities and obligations of Seller.

## ARTICLE 2
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer (which representations and warranties shall be deemed to be made again as of the Closing Date) that:

2.1    Authorization.

(a)    Seller has the right, power and authority to enter into this Agreement and, upon entry of the Sale Order, Seller will have the right, power and authority to consummate the sale of the Assets and the other transactions contemplated by, and otherwise to comply with and perform its obligations under this Agreement;

(b)    Upon entry of the Sale Order, the execution, delivery and performance by Seller of this Agreement will have been duly authorized by all necessary corporate action of Seller in compliance with governing or applicable agreements, instruments or other documents (including, as applicable, its articles of incorporation, bylaws, and applicable law; and

(c)    This Agreement constitutes the valid and binding agreement of Seller, enforceable against Seller in accordance with its terms, subject to the terms of the Sale Order.

2.2    Noncontravention.  Except as set forth in the Sale Order, the execution, delivery and performance by Seller of this Agreement and the consummation by Seller of the transactions contemplated hereby do not and will not (i) conflict with or result in a violation of any provision of, or constitute (with or without the giving of notice or the passage of time or both) a default which would give rise to any right of termination,

cancellation or acceleration under any note, mortgage, lease, contract, agreement or other instrument or obligation to which Seller is a party or by which Seller or any of Seller's properties may be bound, other than lien instruments securing indebtedness to be released at or before the Closing, (ii) result in the creation or imposition of any liens, charges, pledges, options, mortgages, deeds of trust, security interests, claims, restrictions (whether on voting, sale, transfer, disposition or otherwise), easements, and other encumbrances of every type and description, whether imposed by law, agreement, understanding or otherwise (any "*Encumbrance*") upon the properties of Seller, (iii) violate any statute, law, rule or regulation, or any judgment, order, writ, injunction or decree (an "*Applicable Law*") of any court or tribunal in any jurisdiction (domestic or foreign) or any public, governmental or regulatory body, agency, department, commission, board, bureau, or other authority or instrumentality (domestic or foreign) (a "*Governmental Entity*") to which Seller is subject or (iv) violate or conflict with any provision of the certificate of incorporation, Bylaws or other governing documents of Seller as amended to the date hereof.

2.3    <u>Governmental Approvals</u>.   Other than obtaining the Sale Order, no consent, approval, order or authorization of, or declaration, filing, or registration with, any Governmental Entity is required to be obtained or made by Seller in connection with the execution, delivery, or performance by Seller of this Agreement, or the consummation by Seller of the transactions contemplated hereby.

2.4    <u>Financial Statements</u>.   Seller has delivered to Buyer copies of Seller's balance sheet for the Business as of October 31, 2019 and the related statements of income certified by Seller (collectively, the "*Financial Statements*").   The Financial Statements fully and fairly set forth the financial condition of the Business as of the dates indicated, and the results of its operation for the periods indicated, in accordance with the methods historically used by Seller.

2.5    <u>Absence of Certain Changes</u>.   Other than mechanical failures and other problems affecting three trucks and one forklift owned by Seller and the filing of the Chapter 11 Case, since October 31, 2019 (a) there has not been any material adverse change in, or any event or condition that might reasonably be expected to result in any material adverse change in, the business, assets, results of operations, condition (financial or otherwise), or prospects of Seller; (b) the business of Seller has been conducted only in the ordinary course consistent with past practice; (c) Seller has not incurred any material liability, engaged in any material transaction, or entered into any material agreement outside the ordinary course of business consistent with past practice; and (d) Seller has not suffered any material loss, damage, destruction, or other casualty to any of its assets (whether or not covered by insurance).

2.6    <u>Legal Proceedings</u>.   Other than the Chapter 11 Case and as set forth in <u>Exhibit 2.6</u> attached hereto, there are no proceedings, actions, claims, suits, investigations or inquiries by or before any arbitrator or Governmental Entity ("*Proceedings*") pending or, to the best knowledge of Seller, threatened against or

involving Seller in connection with the Business or affairs of Seller or any Assets. There are no Proceedings pending or, to the best knowledge of Seller, threatened that seek to restrain, prohibit, or obtain damages or other relief in connection with this Agreement or the transactions contemplated hereby.

2.7    Title to Property. The Assets are free and clear of all Encumbrances, except (a) liens for taxes not yet due and payable ("*Permitted Encumbrances*"), and (b) liens that will be removed pursuant to the Sale Order. Upon entry of the Sale Order and the consummation of the transactions contemplated hereby, Seller will sell, assign, transfer and convey to Buyer, and Buyer will acquire, all right, title and interest in and to the Assets free and clear of any and all Encumbrances other than the Permitted Encumbrances.

2.8    Sufficiency and Condition of Assets. The Assets constitute all the assets and properties used or held for use in connection with the operating of the Business. All the Assets are (i) in the case of tangible assets and properties, in reasonably good operating condition and repair (ordinary wear and tear excepted) and have been maintained in accordance with standard industry practice; and (ii) reasonably suitable for the purposes used. Seller owns or otherwise has a valid right to use all the Assets. The list of items held in storage by Seller for the benefit of its customers, and all available contact information for all of Seller's past and present customers, all of which Seller is required to deliver to Buyer at or before Closing pursuant to Sections 1.1 and 1.4 above, are accurate and complete in all material respects.

2.9    Leased Real and Personal Property. Set forth on Exhibit 2.9 are all leases under which Seller is the lessee of real or personal property used or held for use in connection with the operation of the Business, all of which leases Seller shall reject in the Chapter 11 Case unless otherwise required under the Sale Order or agreed to by the parties.

2.10    Permits. To the best knowledge of Seller, Seller holds all licenses, permits and other authorizations ("*Permits*") necessary or required for the conduct of the Business as currently conducted. Each of such Permits is in full force and effect, Seller is in compliance with all its obligations with respect thereto, and, to the best knowledge of Seller, no event has occurred which permits, or with or without the giving of notice or the passage of time or both would permit, the revocation or termination of any thereof. No notice has been issued by any Governmental Entity and no Proceeding is pending or, to the best knowledge of Seller, threatened with respect to any alleged failure by Seller to have any Permit or to be in compliance therewith.

2.11    Environmental Matters. To the best knowledge of Seller, neither Seller nor any property owned or leased by Seller (for purposes of this Section 2.11, the "*Property*") is (a) in violation of, (b) subject to any pending or, to the knowledge of Seller, threatened Proceeding under, or (c) subject to any remedial obligations under, any Applicable Laws pertaining to health, safety, the environment, hazardous substances, or

solid wastes ("_Environmental Laws_").   To the best knowledge of Seller, no Hazardous Substance is present or has been installed, released, discharged, placed, dumped or otherwise come to be located in any Property.   The representations and warranties set forth in the preceding sentences of this Section 2.11 would continue to be true and correct following disclosure to the applicable Governmental Entities of all relevant facts, conditions and circumstances, if any, pertaining to the Property.   "_Hazardous Substance_" means any chemicals, materials, wastes or substances that are defined, regulated, determined or identified as toxic or hazardous in any Environmental Law and any asbestos, polychlorinated biphenyls, urea formaldehyde, lead based paint, petroleum, petroleum products, oil, solid waste, pollutants, and other contaminants.

2.12   Employee Matters.

(a)   (i) There are no collective bargaining agreements or other similar agreements, arrangements or understandings, written or oral, with employees as a group to or by which Seller is a party or is bound; (ii) no employees of Seller are represented by any labor organization, collective bargaining representative, or group of employees; (iii) no labor organization, collective bargaining representative, or group of employees claims to represent a majority of the employees of Seller in a unit of Seller; (iv) Seller has not been involved with any representational campaign by any union or other organization or group seeking to become the collective bargaining representative of any of its employees, or been subject to or, to the best knowledge of Seller, threatened with any strike or other concerted labor activity or dispute; and (v) Seller is not obligated to bargain collectively with respect to wages, hours, and other terms and conditions of employment with any recognized or certified labor organization, collective bargaining representative, or group of employees.

(b)   Seller has complied with and shall comply with (to the extent required under the Bankruptcy Code) all of Seller's obligations with respect to its employees and employment related contracts, including, without limitation, Seller's employee benefit plans.   Buyer shall have no obligations with respect to any of the same.

2.13   Existence; Good Standing; Corporate Authority; Compliance With Law. Seller (a) is a corporation duly incorporated, validly existing and in good standing under the laws of Texas; (b) is duly licensed or qualified to do business as a foreign corporation and is in good standing under the laws of any other jurisdictions in which the character of the properties owned or leased by it therein or in which the transaction of its business makes such qualification necessary; (c) has all requisite corporate power and authority to own its properties and carry on its business as now conducted; (d) is not in default with respect to any known order of any court, governmental authority or arbitration board or tribunal to which Seller is a party or is subject; (e) to the best knowledge of Seller,  is not in violation of any laws, ordinances, governmental rules or regulations to which it is subject; and (f) to the best knowledge of Seller, has obtained

all licenses, permits and other authorizations and has taken all actions required by applicable laws or governmental regulations in connection with its business as now conducted.

2.14   No Brokers.  Except for the agreement Seller has entered into with First Business Resources, Inc. (the "*Broker*"), Seller has not entered into any contract, arrangement or understanding with any person or firm that may result in the obligation of Buyer or Seller to pay any finder's fees, brokerage or agent's commissions or other like payments in connection with the negotiations leading to this Agreement or the consummation of the transactions contemplated hereby, and Seller is not aware of any claim or basis for any claim for payment of any finder's fees, brokerage or agent's commissions or other like payments in connection with the negotiations leading to this Agreement or the consummation of the transactions contemplated hereby.  Seller shall be solely responsible for all fees due the Broker.

2.15   Taxes.  To the best knowledge of Seller, other than as set forth on Exhibit 2.15, Seller (a) has duly and timely filed or caused to be filed (except when filing has been lawfully extended) all federal, state, local and foreign tax returns (including, without limitation, consolidated and/or combined tax returns) required to be filed by it prior to the date hereof which relate to it or with respect to which it or the Assets are liable or otherwise in any way subject; (b) has paid or fully accrued for all taxes shown to be due and payable on such returns (which taxes are all the taxes due and payable under the laws and regulations pursuant to which such returns were filed); and (c) has properly accrued for all such taxes accrued in respect of it or the Assets for periods subsequent to the periods covered by such returns.  To the best knowledge of Seller, other than as set forth on Exhibit 2.15, no deficiency in payment of taxes for any period has been asserted by any taxing body and remains unsettled at the date hereof.

2.16   Non-Infringement.  To Seller's best knowledge, Seller has sufficient title and ownership of, and the Assets include, all patents, trademarks, service marks, trade names, copyrights, trade secrets, information, proprietary rights and processes necessary for the Business as now conducted without any conflict with or infringement of the rights of others.  Seller has not received any communications alleging that Seller has violated any of the patents, trademarks, service marks, trade names, copyrights or trade secrets or other proprietary rights of any other person or entity.

ARTICLE 3
REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that:

3.1   Organization.  Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Texas and has all requisite power and authority to own, lease and operate its properties and to carry on its business as now being conducted.

3.2    <u>Authority Relative to This Agreement</u>.    Subject to the provisions of the Sale Order, Buyer has full power and authority to execute, deliver and perform this Agreement and each other agreement, instrument or document executed or to be executed by Buyer in connection with the transactions contemplated hereby, and to consummate the transactions contemplated hereby and thereby.    The execution, delivery and performance by Buyer of this Agreement and the consummation by it of the transactions contemplated hereby, have been duly authorized by all necessary action of Buyer.    This Agreement has been duly executed and delivered by Buyer and constitutes, and each other agreement, instrument or document executed or to be executed by Buyer in connection with the transactions contemplated hereby, has been or, when executed, will be, duly executed and delivered and will constitute, a valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, subject to (i) the effects of bankruptcy, insolvency, moratorium, reorganization, fraudulent conveyance or other similar laws affecting creditors' rights generally, (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law), and (iii) implied covenants of good faith and fair dealing.

3.3    <u>Noncontravention</u>.  The execution, delivery and  performance by Buyer of this Agreement and the consummation by it of the transactions contemplated hereby do not and will not (i) conflict with or result in a violation of any provision of its organizational documents, (ii) conflict with or result in a violation of any provision of, or constitute (with or without the giving of notice or the passage of  time or both) a default which will give rise to any right of termination, cancellation or acceleration under, any note, mortgage, lease, contract, agreement or other instrument or obligation to which Buyer is a party or by which Buyer or any of its properties may be bound, (iii) result in the creation or imposition of any encumbrance upon the properties of Buyer, or (iv) violate any Applicable Law binding upon Buyer.

3.4    <u>Governmental Approvals</u>.    Other than the Sale Order, no consent, approval, order or authorization of, or declaration, filing or registration with, any Governmental Entity is required to be obtained or made by Buyer in connection with the execution, delivery or performance by Buyer of this Agreement or the consummation by it of the transactions contemplated hereby.

3.5    <u>No Brokers</u>.  Buyer has not entered into any contract, arrangement or understanding with any person or firm which may result in the obligation of Buyer or Seller to pay any finder's fees, brokerage or agent's commissions or other like payments in connection with the negotiations leading to this Agreement or the consummation of the transactions contemplated hereby, and Buyer is not aware of any claim or basis for any claim for payment of any finder's fees, brokerage or agent's commissions or other like payments in connection with the negotiations leading to this Agreement or the consummation of the transactions contemplated hereby.

## ARTICLE 4
## CONDUCT OF BUSINESS PENDING CLOSING

Seller hereby covenants and agrees with Buyer as follows:

4.1    Conduct and Preservation of Business.  At all times prior to the Closing Date, Seller shall conduct the Business in the usual and ordinary course and in accordance with its obligations as debtor-in-possession under the Bankruptcy Code. Except as otherwise contemplated under this Agreement or ordered by the Bankruptcy Court, from the date hereof until the Closing Date, without the prior written consent of Buyer, which consent will not be unreasonably withheld or delayed, Seller shall (x) refrain from selling, assigning, licensing, leasing, transferring or otherwise disposing of, in whole or in part, any of the Assets, except for sales made in the ordinary course of business, and (y) make no change in policies or practices with respect to the payment of accounts payable or accrued expenses or the collection of accounts receivable or other receivables, including any acceleration or deferral of the payment or collection thereof, as applicable, in each case, other than in the ordinary course of business.

4.2    Bankruptcy Court Approvals.

(a)    Sale Pleadings.  Seller has filed with the Bankruptcy Court a motion (the "*Motion*") requesting, among other things, approval of this Agreement and approval of the sale of the Assets to Buyer as contemplated herein.

(b)    Termination Fee.  Buyer shall be entitled to a termination fee in the amount of $15,000 (the "*Termination Fee*") upon consummation of an asset sale transaction, a series of asset sale transactions, a merger or consolidation of or involving Seller, a liquidation of Seller, or any other transaction or event or series of transactions or events that (i) do not involve Buyer or its affiliate and (ii) would make it impossible for the Parties to consummate the sale of the Assets as contemplated in this Agreement (an "Alternative Transaction").   The parties hereto each hereby acknowledge and agree that Buyer has incurred substantial costs and expenses relating to this transaction, including without limitation, the costs and expenses associated with the performance of due diligence of Seller, the negotiation and execution of this Agreement (and the exhibits related thereto) and the documents that preceded this Agreement, and has undertaken substantial risk as a result of incurring such costs and expenses.  Consistent with the Sale Order, the Termination Fee shall be paid without the need for any further order of the Bankruptcy Court, from the proceeds of the first scheduled closing of any Alternative Transaction and, if applicable, from the proceeds of each subsequent closing until paid in full; provided, however, that if the Alternative Transaction is a plan of reorganization, then the Termination Fee shall be paid upon the effective date of such plan.  The procedures applicable to the auction of the Assets (the "*Auction*") shall be as set forth in the Sale Order.

(c)    <u>Entry of Orders</u>.  The Sale Order shall have been entered by the Bankruptcy Court on or before May 31, 2020.

(d)    <u>Sale Order</u>.  For the purposes of this Agreement, "*Sale Order*" shall refer to an order entered by the Bankruptcy Court, in form and substance satisfactory to Buyer in its reasonable discretion, which, among other things:

(i)    Approves this Agreement (as and to the extent modified, if any, with any such modification agreed to by the Buyer);

(ii)    Finds that the Buyer has acted in good faith and is therefore entitled to the protections of Section 363(m) of the Bankruptcy Code;

(iii)    Acknowledges that the sale is a valid exercise of Seller's business judgment;

(iv)    Authorizes and approves, to the fullest extent permitted under Sections 105, 363(b) and 363(f) of the Bankruptcy Code, the sale of the Assets free and clear of any liens, claims and encumbrances, including but not limited to the Encumbrances and declaring that Buyer has no liability and no successor liability with respect to the Assets;

(v)    Declares that, pursuant to Bankruptcy Rules 6006(d) and 6004(g), the Sale Order shall not be stayed but shall be effective immediately;

(vi)    Authorizes and approves the assumption and assignment of applicable assigned contracts free and clear of any Encumbrance to the fullest extent permitted under Section 365 of the Bankruptcy Code, except for Buyer's obligations as assignee of Seller under the Assigned Contracts and this Agreement; and

(vii)    Directs Seller to execute, upon request by Buyer, one or more assignments in form, substance, and number reasonably acceptable to Buyer, evidencing the conveyance of the Assets to Buyer.

## ARTICLE 5
## ADDITIONAL AGREEMENTS

5.1    <u>Notification to Customers</u>.    Upon consummation of the transaction contemplated in this Agreement, Seller shall cooperate fully with Buyer in issuing a joint announcement to all of Seller's customers, prepared by Buyer and reasonably acceptable to Seller, announcing the transaction, endorsing Buyer, and encouraging all of Seller's customers to do business with Buyer.  Seller shall take all additional steps reasonably requested by Buyer to transition all such customers to Buyer.

5.2     <u>Notice of Litigation</u>.  Seller, upon learning of the same, shall promptly notify Buyer of any Proceeding (other than the Chapter 11 Case) which is commenced or threatened against Seller and which affects this Agreement or the transactions contemplated hereby and any Proceeding which is commenced or threatened against Seller.

5.3     <u>Notification of Certain Matters</u>.  Seller shall give prompt notice to Buyer of (i) the occurrence or nonoccurrence of any event, the occurrence or nonoccurrence of which would be likely to cause any representation or warranty contained in <u>Article II</u> to be untrue or inaccurate at or prior to the Closing, and (ii) any failure of Seller to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by such person hereunder.   Buyer shall give prompt notice to Seller of (a) the occurrence or nonoccurrence of any event, the occurrence or nonoccurrence of which would be likely to cause any representation or warranty contained in <u>Article III</u> to be untrue or inaccurate at or prior to the Closing, and (b) any failure of Buyer to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by Buyer hereunder.  The delivery of any notice pursuant to this <u>Section 5.3</u> shall not be deemed to (x) modify the representations or warranties hereunder of the party delivering such notice, (y) modify the conditions set forth in <u>Articles VI</u> and <u>VII</u>, or (z) limit or otherwise affect the remedies available hereunder to the party receiving such notice.

5.4     <u>Fees and Expenses</u>.  Buyer shall pay all fees and expenses incurred by it in connection with this Agreement and the transactions contemplated hereby.  Except as otherwise specified in the Sale Order, Seller shall pay all fees and expenses incurred by Seller in connection with this Agreement and the transactions contemplated hereby.

5.5     <u>Transfer Taxes</u>.   Any and all transfer taxes and fees incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by Buyer, and Buyer shall file all necessary documentation with respect to, and make all payments of, such taxes and fees on a timely basis.

5.6     <u>Books and Records</u>.  Buyer shall maintain for two years after the Closing the books and records regarding Seller and the Business which come from Seller.

5.7     <u>Employees; Employee Compensation</u>.   Upon the execution of this Agreement, Seller will inform its employees of the sale of the purchased Assets to Buyer.  Seller waives any claims against Buyer or any employees of Seller arising from any subsequent employment by Buyer.  Nothing contained in this Agreement shall confer upon any employee any right with respect to continued employment by Seller or Buyer.   No provision of this Agreement shall create any third-party rights in any employee, or any beneficiary or dependent thereof, with respect to the compensation, terms and conditions of employment and benefits that may be provided to such employee by Buyer or under any benefit plan that Buyer may maintain.  Seller shall provide Buyer with a list of Seller's employees, if any, to whom Buyer intends to offer

employment on the Closing Date, provided such list shall not obligate Buyer to offer such employment if Buyer should later determine it is not in its interest to offer such employment to any person included in the list.

5.8   Confidentiality.

(a)   Buyer agrees that if the transaction contemplated hereby is not consummated, Buyer shall return all information received by Buyer from Seller as part of its due diligence and will not use or disclose such information, including without limitation, Seller's client list.

(b)   Seller acknowledges and agrees that all information, documents, methods, files and other papers concerning the Assets and the Business that are not publicly available (collectively, the "*Confidential Information*") are confidential. After the Closing, Seller shall not, at any time, reveal, divulge, or make known to any person (other than Buyer) except as required by law or the Sale Order, or use for its benefit, any of the Confidential Information.

5.9   Noncompetition.  Seller covenants and agrees that it shall not, for a period of one year from and after the Closing Date, within the United States of America, working alone or in conjunction with one or more other persons or entities, for compensation or not, directly or indirectly, whether as an owner, partner, member, shareholder, investor, officer, director, employee, agent, manager, consultant, or otherwise, permit Seller's name to be used by or engage in or carry on any business in competition with the Business or similar to the Business or solicit, divert, entice, take away or interfere with, or attempt to solicit, divert, entice, take away or interfere with, any of the Buyer's business, patronage or customers, nor aid or assist anyone else, except Buyer, to do so.  The term of the covenants contained in this section shall be tolled for the period commencing on the date any successful action is filed for injunctive relief or damages arising out of a breach by Seller of this section and ending upon final adjudication (including appeals) of such action.  If, in any judicial proceeding, the court shall refuse to enforce the covenants contained in this section because the time limit is too long, it is expressly understood and agreed between the parties hereto that for purposes of such proceeding such time limitation shall be deemed reduced to the extent necessary to permit enforcement of such covenants.  If, in any judicial proceeding, the court shall refuse to enforce the covenants contained in this section because it is more extensive (whether as to geographic area, scope of business or otherwise) than necessary to protect the business and goodwill of Buyer, it is expressly understood and agreed between the parties hereto that for purposes of such proceeding the geographic area, scope of business or other aspect shall be deemed reduced to the extent necessary to permit enforcement of such covenants.  Seller acknowledges that a breach of this section would cause irreparable damage to Buyer, and in the event of its actual or threatened breach of the provisions of this section, Buyer shall be entitled to a temporary restraining order and an injunction restraining Seller from breaching such covenants without the necessity of posting bond or proving irreparable harm, such being

conclusively admitted by Seller.  Nothing shall be construed as prohibiting Buyer from pursuing any other available remedies for such breach or threatened breach, including the recovery of damages from Seller.  Seller acknowledges that the restrictions set forth in this section are reasonable in scope and duration, given the nature of the business of Buyer.  Notwithstanding the foregoing, the parties expressly agree that Seller shall be released from the restrictive covenants set forth in this section in the event of a material breach by Buyer under the terms of this Agreement and such breach is not cured by Buyer within thirty (30) days of its receipt of written notice of such breach.

## ARTICLE 6
## CONDITIONS TO OBLIGATIONS OF SELLER

The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment on or prior to the Closing Date of each of the following conditions:

6.1     Representations and Warranties True.    All the representations and warranties of Buyer contained in this Agreement shall be true and correct on and as of the Closing Date as if made on and as of such date, except to the extent that any such representation or warranty is made as of a specified date, in which case such representation or warranty shall have been true and correct as of such specified date and Seller shall have received a certificate of Buyer, dated the Closing Date, to such effect.

6.2     Covenants and Agreements Performed.  Buyer shall have performed and complied with all covenants and agreements required by this Agreement to be performed or complied with by it on or prior to the Closing Date.

6.3     Legal Proceedings.  No Proceeding shall, on the Closing Date, be pending or threatened seeking to restrain, prohibit, or obtain damages or other relief in connection with this Agreement or the consummation of the transactions contemplated hereby.

6.4     Consents.  All consents and approvals of third parties required to be obtained by or on the part of the parties hereto or otherwise necessary for the consummation of the transactions contemplated hereby shall have been obtained, and all thereof shall be in full force and effect at the time of Closing.

6.5     Approval of Bankruptcy Court.  The Bankruptcy Court shall have entered issued the Sale Order.

6.6     Other Conditions.

(a)     Payment of an amount equal to the Purchase Price minus the Earnest Money by Buyer, and the Earnest Money shall be credited to the Purchase Price; and

(b)     Buyer shall have taken such other actions as Seller reasonably requests in order to consummate the transactions contemplated hereby.

ARTICLE 7
CONDITIONS TO OBLIGATIONS OF BUYER

The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment on or prior to the Closing Date of each of the following conditions:

7.1     Representations and Warranties True.   All the representations and warranties of Seller contained in this Agreement shall be true and correct on and as of the Closing Date as if made on and as of such date, except to the extent that any such representation or warranty is made as of a specified date, in which case such representation or warranty shall have been true and correct as of such specified date, and Buyer shall have received a certificate of Seller, dated the Closing Date, to such effect.

7.2     Covenants and Agreements Performed.  Seller shall have performed and complied with all covenants and agreements required by this Agreement to be performed or complied with by Seller on or prior to the Closing Date.

7.3     Legal Proceedings.  No Proceeding shall, on the Closing Date, be pending or threatened seeking to restrain, prohibit, or obtain damages or other relief in connection with this Agreement or the consummation of the transactions contemplated hereby.

7.4     Approval of Bankruptcy Court.  The Bankruptcy Court shall have issued the Sale Order.

7.5     No Material Adverse Change.  Other than mechanical failures and other problems affecting three trucks and one forklift owned by Seller and the filing of the Chapter 11 Case, since October 31, 2019, there shall not have been any material adverse change in the business, assets, results of operations, condition (financial or otherwise), or prospects of Seller, and Buyer shall have received a certificate of Seller, dated the Closing Date, to such effect.

7.6     Real Property Lease.  Buyer and NWP TX TT, LLC a Delaware limited liability company (the "_Landlord_") shall have entered (or shall be prepared to enter) into a lease agreement for the premises located at 310 W. Mockingbird Lane, Dallas, Texas 75247 that is in form and substance reasonably acceptable to Buyer.

7.7   Other Documents.  Buyer shall have received the certificates, instruments and documents listed below:

(a)   The conveyance documents contemplated by Section 1.4 above; and

(b)   Such other certificates, instruments and documents as Buyer shall reasonably request.

7.8   Consents.  All consents and approvals of third parties required to be obtained by or on the part of the parties hereto or otherwise necessary for the consummation of the transactions contemplated hereby shall have been obtained, and all thereof shall be in full force and effect at the time of Closing.

7.9   No Diminution in Assets.   There shall not have been any material diminution in the asset listing prepared by Seller.  Buyer shall have received a certificate to such effect, in form reasonably acceptable to Buyer, to such effect, executed by an authorized person on behalf of Seller.

7.10   Other Conditions.  Buyer shall have taken such other actions as Buyer reasonably requests in order to consummate the transactions contemplated hereby.

## ARTICLE 8
## TERMINATION, AMENDMENT AND WAIVER

8.1   Termination.   This Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing in the following manner:

(a)   By mutual written consent of Buyer and Seller (subject to the approval of the Bankruptcy Court) at any time;

(b)   Upon written notice from Buyer to Seller (i) if one or more of the conditions set forth in Article 7 is not timely satisfied for any reason other than a breach of this Agreement by Buyer, including if the Sale Order is not entered in accordance with the terms of this Agreement, or (ii) if the Sale Order is not entered by the Bankruptcy Court on or before May 31, 2020, through no fault of Buyer;

(c)   Upon written notice from Seller to Buyer if Buyer is not the winning bidder at the Auction;

(d)     Upon written notice from Seller to Buyer if any of the conditions precedent to Seller's obligations hereunder shall have become incapable of fulfillment through no fault of Seller;

(e)     Upon written notice from either party to the other party if the Closing does not occur on or before June 15, 2020 (unless the failure to consummate the purchase and sale of the Assets by such date shall be due to the action or failure to act of the party seeking to terminate this Agreement or any affiliate thereof);

(f)     By Seller (i) if any of the representations and warranties of Buyer contained in this Agreement shall not be true and correct, when made or at any time prior to Closing as if made at and as of such time, or (ii) if Buyer shall have failed to fulfill any of its obligations under this Agreement and, in the case of each of clauses (i) and (ii), such misrepresentation, breach of warranty or failure (provided it can be cured) has not been cured within 30 days of actual knowledge thereof by Buyer; or

(g)   By Buyer, (i) if any of the representations and warranties of Seller contained in this Agreement shall not be true and correct when made or at any time prior to the Closing as if made at and as of such time, or (ii) if Seller shall have failed to fulfill any of Seller's obligations under this Agreement, and, in the case of each of clauses (i) and (ii), such misrepresentation, breach of warranty, or failure (provided it can be cured) has not been cured within 30 days of actual knowledge thereof of Seller.

8.2     Effect of Termination.     Should either party wish to terminate this Agreement, such party shall deliver written notice thereof to the other party, copying the Law Firm and specifying the provision of Section 8.1 triggering such termination.  If Seller issues such a notice of termination pursuant to Section 8.1(f) and Buyer does not object within 15 business days of the date of delivery of said notice of termination, this Agreement shall be terminated upon the expiration of such 15-day period and the Law Firm shall promptly disburse the Earnest Money to Seller.  If either party issues notice of termination of this Agreement pursuant to any provision of this Agreement other than Section 8.1(f) and the other party does not object within 15 business days of the date of delivery of such termination notice, this Agreement shall be terminated upon the expiration of such 15-day period and the Law Firm shall promptly disburse the Earnest Money to Buyer.  In the event of a dispute regarding termination of this Agreement or disbursement of the Earnest Money, the Law Firm may at any time tender the Earnest Money to the registry of a court having jurisdiction, after which Buyer and Seller shall resolve the dispute in such manner as they see fit.  Nothing contained in this Section 8.2 shall relieve any party from liability for any breach of this Agreement.

8.3     Amendment.     This Agreement may not be amended except by an instrument in writing signed by or on behalf of all the parties hereto.

8.4    <u>Waiver</u>.  Seller, on the one hand, and Buyer, on the other, may (a) waive any inaccuracies in the representations and warranties of the other contained herein or in any document, certificate, or writing delivered pursuant hereto or (b) waive compliance by the other with any of the other's agreements or fulfillment of any conditions to its obligations contained herein.  Any agreement on the part of a party hereof to any such waiver shall be valid only if set forth in an instrument in writing signed by or on behalf of such party.  No failure or delay by a party hereto in exercising any right, power, or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power, or privilege.

8.5    <u>Remedies Not Exclusive</u>.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.  The rights and remedies of any party based upon, arising out of, or otherwise in respect of any inaccuracy in or breach of any representation, warranty, covenant, or agreement contained in this Agreement shall in no way be limited by the fact that the act, omission, occurrence, or other state of facts upon which any claim of any such inaccuracy or breach is based may also be the subject matter of any other representation, warranty, covenant, or agreement contained in this Agreement (or in any other agreement between the parties) as to which there is no inaccuracy or breach.

## ARTICLE 9
## SURVIVAL OF REPRESENTATIONS

9.1    <u>Survival</u>.    The representations and warranties of the parties hereto contained in this Agreement or in any certificate, instrument, or document delivered pursuant hereto shall survive the Closing. The provisions of <u>Sections 1.2(a)</u>, <u>5.4</u>, <u>5.8</u>, <u>8.2</u>, and this <u>Section 9.1</u> shall survive termination of this Agreement.

## ARTICLE 10
## MISCELLANEOUS

10.1    <u>Notices</u>.    All notices, requests, demands, and other communications required or permitted to be given or made hereunder by any party hereto shall be in writing and shall be deemed to have been duly given or made if delivered personally, or transmitted by first class registered or certified mail, postage prepaid, return receipt requested, or sent by prepaid overnight delivery service, or sent by cable, telegram, telefax, or telex, to the parties at the addresses set forth next to their names on the signature page hereof (or at such other addresses as shall be specified by the parties by like notice).

10.2    <u>Entire Agreement</u>.  This Agreement, together with the Exhibits and other writings referred to herein or delivered pursuant hereto, constitute the entire agreement between the parties hereto with respect to the subject matter hereof and supersede all

prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof.

10.3    Binding Effect; Assignment; No Third-Party Benefit.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and permitted assigns.  Seller may not assign this Agreement nor any of Seller's rights, interests, or obligations hereunder without the prior written consent of Buyer.  Buyer may assign any of Buyer's rights, interests, or obligations hereunder, upon notice to Seller, provided that no such assignment shall relieve Buyer of its obligations hereunder.  Except as provided in Article 9, nothing in this Agreement, express or implied, is intended to or shall confer upon any person other than the parties hereto, and their respective heirs, legal representatives, successors and permitted assigns, any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement.

10.4    Severability.    If any provision of this Agreement is held to be unenforceable, this Agreement shall be considered divisible and such provision shall be deemed inoperative to the extent it is deemed unenforceable, and in all other respects this Agreement shall remain in full force and effect; provided, however, that if any such provision may be made enforceable by limitation thereof, then such provision shall be deemed to be so limited and shall be enforceable to the maximum extent permitted by Applicable Law.

10.5    Governing Law.  This Agreement shall be governed by and construed and interpreted according to the internal laws of the State of Texas, determined without reference to conflicts of law principles and the Bankruptcy Code.  The Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court) shall have exclusive jurisdiction with respect to the interpretation of this Agreement and any other agreement or instrument contemplated hereby or entered into in connection herewith, or any of the transactions contemplated hereby or thereby, and the parties hereto hereby irrevocably submit to such jurisdiction and irrevocably agree that all claims in respect of any such dispute or proceeding may be heard and determined in such courts.  Each party irrevocably consents to the service of any and all process in any action or proceeding arising out of or relating to this Agreement by the transmitting of copies of such process to each party at its address specified on the signature page hereto in a manner provided for in Section 10.1.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum in connection therewith.

10.6    Further Assurances.  From time to time following Closing, at the request of any party hereto and without further consideration, the other party or parties hereto shall execute and deliver to such requesting party such instruments and documents and take such other action (but without incurring any material financial obligation) as such

requesting party may reasonably request in order to consummate more fully and effectively the transactions contemplated hereby.

10.7   <u>Attorneys Fees</u>.   The prevailing party in any proceeding based on or arising out of this Agreement shall be entitled to recover from the non-prevailing party reasonable attorneys' fees in connection with such proceeding.

10.8   <u>Descriptive Headings</u>.   The descriptive headings herein are inserted for convenience of reference only, do not constitute a part of this Agreement, and shall not affect in any manner the meaning or interpretation of this Agreement.

10.9   <u>Counterparts</u>.   This Agreement may be executed by the parties hereto in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same agreement.   Each counterpart may consist of a number of copies hereof each signed by less than all, but together signed by all, the parties hereto.

*[SIGNATURE PAGE FOLLOWS]*

## EXECUTION

The parties have executed this Agreement as of the day and year first above written.

Address:

460 West Mockingbird Lane
Dallas, TX 75247

**BUYER:**

**CSMS, LLC**
a Texas limited liability company

By: _____
    Name (print):
    Title:

Address:

310 W. Mockingbird Lane
Dallas, TX 75247

**SELLER:**

**Eveready Services, Inc.**
a Texas corporation

By: _____
    Name (print):
    Title:

## LAW FIRM:

*(Signing only to affirm its agreement to comply with provisions hereof related to the Earnest Money).*

Address:

500 North Akard, Suite 2700
Dallas, TX 75201

**Scheef & Stone, LLP**
a Texas limited liability partnership

By: _____
    Bill Stone, Partner

# EXHIBIT 1.1

# ASSETS

*[BEGINS ON NEXT PAGE]*

Exhibit 1.1

Exhibit 1.1

## EVEREADY SERVICES
## TRUCK ASSESTS

1. 2004 Mitsubishi Fuso FM260; VIN. JL6DEM1E04K008296; 24' Supreme Van Body; Gym Floor; Wood Slat Walls; Hydraulic Lift Gate; 132,635 Miles *DISABLED-METER*

2. 2007 Mitsubishi Fuso FM260; VIN. JL6DHM1E07K007029; 24' Supreme Van Body; Gym Floor; Wood Slat Walls; Hydraulic Lift Gate; 212,650 Miles

3. 2004 Mitsubishi Fuso FH-SP; VIN. JL6CCJ1G44K008089; 20' Supreme Van Body; Gym Floor; Wood Slat Walls; Hydraulic Lift Gate; 144,834 Miles *DISABLED - MOTOR*

4. 2007 Mitsubishi Fuso FM260; VIN. JL6DHM1E97K004212; 24' Supreme Van Body; Gym Floor; Wood Slat Walls; Hydraulic Lift Gate; 265,813 Miles *DISABLED - TRANS*

5. 2004 Mitsubishi Fuso FH-SP; VIN. JL6CCJ1GO4K000605; 20' Supreme Van Body; Gym Floor; Wood Slat Walls; Hydraulic Lift Gate; 141,623 Miles

6. 2005 Mitsubishi Fuso FM260; VIN. JL6DGM1E05K009749; 24' Supreme Van Body; Gym Floor; Wood Slat Walls; Hydraulic Lift Gate; 214,153 Miles

Exhibit 1.1

| RACK | Supports 2"x 4" x 4' | 28 | Art Storage (Warehouse) | ESI |
|------|----------------------|-----|------------------------|-----|
| RACK | Upright 8' x 4' | 4 | Art Storage (Warehouse) | ESI |
| RACK | Beams 3" - 4" x 8' | 16 | Art Storage Large | ESI |
| RACK | Decks 1/2" particle board 4x8 | 8 | Art Storage Large | ESI |
| RACK | Panels, steel perforated | 6 | Art Storage Large | ESI |
| RACK | Supports 2" x 4" x 4' | 32 | Art Storage Large | ESI |
| RACK | Upright 8' x 4' | 6 | Art Storage Large | ESI |
| RACK | Beams 3" - 4" x 8' | 128 | Bed/Mattress Rack | ESI |
| RACK | Decks 1/2" particle board 4x8 | 64 | Bed/Mattress Rack | ESI |
| RACK | Supports 2" x 4" x 4' | 512 | Bed/Mattress Rack | ESI |
| RACK | Upright 16' x 4' | 24 | Bed/Mattress Rack | ESI |
| APPL | Freezer, reach-in | 1 | Boxing/Packing Area | ESI |
| APPL | Refrigerator | 1 | Boxing/Packing Area | ESI |
| EQUIP | Scale, old floor scale | 1 | Boxing/Packing Area | ESI |
| FURN | Table, Boxing/Packing | 1 | Boxing/Packing Area | ESI |
| RACK | Beams 3" - 4" x 8' | 4 | Boxing/Packing Area | ESI |
| RACK | Decks 1/2" particle board 4x8 | 2 | Boxing/Packing Area | ESI |
| RACK | Supports 2" x 4" x 4' | 8 | Boxing/Packing Area | ESI |
| RACK | Upright 8' x 4' | 2 | Boxing/Packing Area | ESI |
| EQUIP | Mop bucket w/Mop | 1 | Break Restroom | ESI |
| EQUIP | Waste Bin, Blue round on casters | 1 | Break Restroom | ESI |
| FURN | Table, small side table | 1 | Break Restroom | ESI |
| EQUIP | Waste Bin, black square w/lid | 1 | Break Room | ESI |
| EQUIP | Waste Bin, blue square recycling w/lid | 2 | Break Room | ESI |
| FURN | Table, boat-shaped conference table | 1 | Break Room | ESI |
| FURN | Chair, leather blue | 1 | Delivery Office | ESI |
| I/T | APC UPS | 2 | Delivery Office | ESI |
| I/T | Clock, Atomic | 1 | Delivery Office | ESI |
| I/T | Dell Computer CPU, large/old | 1 | Delivery Office | ESI |
| I/T | Dell Computer CPU, small/new | 1 | Delivery Office | ESI |
| I/T | Dell Monitor, medium/old | 1 | Delivery Office | ESI |
| I/T | Dell Monitor, small/old | 1 | Delivery Office | ESI |
| I/T | Dell Monitor, wide/new | 2 | Delivery Office | ESI |
| I/T | Fire Extinguisher | 3 | Delivery Office | ESI |
| I/T | HP Color LaserJet Printer | 1 | Delivery Office | ESI |
| I/T | Network Switch, Netgear 5-port | 1 | Delivery Office | ESI |
| APPL | Water bottle stand, 6-cap | 1 | Docks 8-9 | ESI |
| EQUIP | Dock Plate | 1 | Docks 8-9 | ESI |
| EQUIP | Dolly, 4-wheel | 1 | Docks 8-9 | ESI |
| EQUIP | Dolly, Blue 4-wheel cart | 1 | Docks 8-9 | ESI |
| EQUIP | Dolly, Plastic work cart | 1 | Docks 8-9 | ESI |
| EQUIP | Dustbin, long-handled large | 1 | Docks 8-9 | ESI |

Exhibit 1.1

| EQUIP | Gondola - corrugated 2' x 2' x 4' (Delivery) | 1 | Docks 8-9 | ESI |
|---|---|---|---|---|
| EQUIP | Noble Floor Scrubber | 1 | Docks 8-9 | ESI |
| EQUIP | Safety Straps, sets | 6 | Docks 8-9 | ESI |
| EQUIP | Waste Bin, Blue round on casters | 1 | Docks 8-9 | ESI |
| SPORT | Basketball Backboard | 1 | Docks 8-9 | ESI |
| FURN | Credenza, traditional wood | 1 | File Room | ESI |
| FURN | File Cabinet, 3-drawer lateral | 1 | File Room | ESI |
| FURN | File Cabinet, 4-drawer lateral | 2 | File Room | ESI |
| FURN | Shelf, Steel wire Metro w/castes (xParravano) | 1 | File Room | ESI |
| FURN | Table, 5' w/Folding legs | 1 | File Room | ESI |
| I/T | Dell Computer CPU, large/old | 1 | File Room | ESI |
| I/T | Dell Monitor, medium/old | 1 | File Room | ESI |
| ACCESS | Chair, Black Leather chair | 1 | Kelly's Office | ESI |
| ACCESS | Desk accessory sorter gray | 2 | Kelly's Office | ESI |
| ACCESS | Desk accessory trays, grey | 3 | Kelly's Office | ESI |
| FURN | File Cabinet, locking | 1 | Kelly's Office | ESI |
| FURN | Sofa, blue | 1 | Kelly's Office | ESI |
| I/T | Dell Computer CPU, small/new | 1 | Kelly's Office | ESI |
| I/T | Dell Monitor, 24" | 1 | Kelly's Office | ESI |
| I/T | HP Color LaserJet Printer | 1 | Kelly's Office | ESI |
| I/T | Speakers, 2 flat panels w/sub | 1 | Kelly's Office | ESI |
| I/T | Speakers, Logitech | 1 | Kelly's Office | ESI |
| APPL | Coffee Grinder, Breville | 1 | Kitchen | ESI |
| APPL | Coffee Maker, KitchenAid | 1 | Kitchen | ESI |
| APPL | Microwave, Emerson | 1 | Kitchen | ESI |
| APPL | Microwave, Kenmore | 1 | Kitchen | ESI |
| APPL | Refrigerator | 1 | Kitchen | ESI |
| APPL | Water bottle stand, 4-cap. | 1 | Kitchen | ESI |
| APPL | Water Cooler | 1 | Kitchen | ESI |
| EQUIP | Waste Bin, black square w/lid | 1 | Kitchen | ESI |
| FURN | Table, system furniture | 1 | Kitchen | ESI |
| ACCESS | Desk accessory trays, black | 2 | Lobby | ESI |
| ACCESS | Desk accessory trays, grey | 2 | Lobby | ESI |
| EQUIP | Fire Extinguisher | 1 | Lobby | ESI |
| FURN | Printer Table | 1 | Lobby | ESI |
| I/T | APC UPS | 1 | Lobby | ESI |
| I/T | Dell Computer CPU, small/new | 1 | Lobby | ESI |
| I/T | Dell computer speakers, pair | 1 | Lobby | ESI |
| I/T | Dell Monitor, wide/new | 1 | Lobby | ESI |
| I/T | HP Multifunction printer | 1 | Lobby | ESI |
| I/T | Pitney Bowes Postage Meter (Lease) | 1 | Lobby | ESI |
| I/T | VOIP Phone | 1 | Lobby | ESI |

Exhibit 1.1

| I/T | Air Conditioner, APC portable | 1 | Machine Room | ESI |
|------|------|------|------|------|
| I/T | APC UPS | 1 | Machine Room | ESI |
| I/T | APC UPS, Black | 1 | Machine Room | ESI |
| I/T | Dell Monitor, small/old | 2 | Machine Room | ESI |
| I/T | Dell Server | 1 | Machine Room | ESI |
| I/T | Router, Peplink | 1 | Machine Room | ESI |
| I/T | Shelf, Steel Wire Metro w/casters | 1 | Machine Room | ESI |
| I/T | Switch, Netgear POE | 1 | Machine Room | ESI |
| EQUIP | Dolly, Appliance | 2 | North Wall Storage | ESI |
| EQUIP | Dolly, Blue 2-Mattress | 1 | North Wall Storage | ESI |
| EQUIP | Dolly, Orange flat-deck | 1 | North Wall Storage | ESI |
| EQUIP | Dolly, Steel handtruck | 4 | North Wall Storage | ESI |
| EQUIP | Dolly, Wheel Dollies (Jeep) | 4 | North Wall Storage | ESI |
| EQUIP | Ladder, Werner Extension (Aluminum) | 2 | North Wall Storage | ESI |
| EQUIP | Ladders, Werner 10' Fiberglass | 2 | North Wall Storage | ESI |
| EQUIP | Rack, Chandelier | 2 | North Wall Storage | ESI |
| EQUIP | Rack, Clothing/Chandelier | 2 | North Wall Storage | ESI |
| EQUIP | Shelf, Steel wire Metro (Baby Doe) | 5 | North Wall Storage | ESI |
| FURN | Table, 5' w/Folding legs | 2 | North Wall Storage | ESI |
| FURN | Table, 8' w/Folding legs | 2 | North Wall Storage | ESI |
| SPORT | Basketball Backboard | 1 | North Wall Storage | ESI |
| FURN | Bookshelf | 1 | RD's Office | ESI |
| FURN | Chair, wood armchair | 2 | RD's Office | ESI |
| FURN | Credenza, traditional wood | 1 | RD's Office | ESI |
| FURN | Desk, traditional wood | 1 | RD's Office | ESI |
| FURN | Table, black side table | 1 | RD's Office | ESI |
| I/T | Canon Digital Camera | 1 | RD's Office | ESI |
| I/T | Dell Computer CPU, small/new | 1 | RD's Office | ESI |
| I/T | Dell Monitor, wide/new | 1 | RD's Office | ESI |
| I/T | HP Color LaserJet Printer | 1 | RD's Office | ESI |
| RACK | Beams 3"-4" x 8' | 18 | Rehearse/Record | ESI |
| RACK | Decks 1/2" particle board 4x8 | 9 | Rehearse/Record | ESI |
| RACK | Supports 2" x 4" x 4' | 36 | Rehearse/Record | ESI |
| RACK | Upright 8' x 4' | 1 | Rehearse/Record | ESI |
| RACK | Beams 3"- 4" x 8' | 2 | Row a-2 | ESI |
| RACK | Beams 3"- 4" x 8' | 144 | Row 1-2 | ESI |
| RACK | Decks 1/2" particle board 4x8 | 2 | Row 1-2 | ESI |
| RACK | Decks 1/2" particle board 4x8 | 72 | Row 1-2 | ESI |
| RACK | Supports 2" x 4" x 4' | 8 | Row 1-2 | ESI |
| RACK | Supports 2" x 4" x 4' | 288 | Row 1-2 | ESI |
| RACK | Upright 12' x 4' | 24 | Row 1-2 | ESI |
| RACK | Upright 8' x 4' | 2 | Row 1-2 | ESI |

Exhibit 1.1

| RACK | Beams 3"- 4" x 8' | 144 | Row 11-12 | ESI |
|------|-------------------|-----|-----------|-----|
| RACK | Decks 1/2" particle board 4x8 | 72 | Row 11-12 | ESI |
| RACK | Supports 2"x 4" x 4' | 288 | Row 11-12 | ESI |
| RACK | Upright 12' x 4' | 24 | Row 11-12 | ESI |
| RACK | Beams 3"- 4" x 8' | 144 | Row 13-14 | ESI |
| RACK | Decks 1/2" particle board 4x8 | 72 | Row 13-14 | ESI |
| RACK | Supports 2"x 4" x 4' | 288 | Row 13-14 | ESI |
| RACK | Upright 12' x 4' | 24 | Row 13-14 | ESI |
| RACK | Beams 3"- 4" x 8' | 108 | Row 17-18 | ESI |
| RACK | Decks 1/2" particle board 4x8 | 54 | Row 17-18 | ESI |
| RACK | Supports 2"x 4" x 4' | 216 | Row 17-18 | ESI |
| RACK | Upright 12' x 4' | 16 | Row 17-18 | ESI |
| RACK | Beams 3"- 4" x 8' | 108 | Row 19-20 | ESI |
| RACK | Decks 1/2" particle board 4x8 | 54 | Row 19-20 | ESI |
| RACK | Supports 2"x 4" x 4' | 216 | Row 19-20 | ESI |
| RACK | Upright 12' x 4' | 16 | Row 19-20 | ESI |
| EQUIP | Ladder, yellow warehouse ladder | 1 | Row 21-22 | ESI |
| RACK | Beams 3"- 4" x 8' | 40 | Row 21-22 | ESI |
| RACK | Decks 1/2" particle board 4x8 | 16 | Row 21-22 | ESI |
| RACK | Supports 2"x 4" x 4' | 64 | Row 21-22 | ESI |
| RACK | Upright 12' x 4' | 12 | Row 21-22 | ESI |
| RACK | Upright 8' x 4' | 4 | Row 21-22 | ESI |
| RACK | Beams 3"- 4" x 8' | 64 | Row 23-24 | ESI |
| RACK | Decks 1/2" particle board 4x8 | 32 | Row 23-24 | ESI |
| RACK | Supports 2"x 4" x 4' | 128 | Row 23-24 | ESI |
| RACK | Upright 12' x 4' | 12 | Row 23-24 | ESI |
| EQUIP | Dolly, Steel handtruck | 1 | Row 25-26 | ESI |
| EQUIP | Lift Dack, 8' Yellow w/Safety rails | 1 | Row 25-26 | ESI |
| EQUIP | Lift, Raymond Order Picker | 1 | Row 25-26 | ESI |
| RACK | Beams 3"- 4" x 8' | 84 | Row 25-26 | ESI |
| RACK | Decks 1/2" particle board 4x8 | 42 | Row 25-26 | ESI |
| RACK | Supports 2"x 4" x 4' | 168 | Row 25-26 | ESI |
| RACK | Upright 12' x 4' | 8 | Row 25-26 | ESI |
| RACK | Beams 3"- 4" x 8' | 84 | Row 27-28 | ESI |
| RACK | Decks 1/2" particle board 4x8 | 42 | Row 27-28 | ESI |
| RACK | Supports 2"x 4" x 4' | 168 | Row 27-28 | ESI |
| RACK | Upright 12' x 4' | 8 | Row 27-28 | ESI |
| EQUIP | Dolly, large 4-wheel furniture | 1 | Row 29-30 | ESI |
| EQUIP | Lift, Raymond Order Picker | 1 | Row 29-30 | ESI |
| RACK | Beams 3"- 4" x 8' | 84 | Row 29-30 | ESI |
| RACK | Decks 1/2" particle board 4x8 | 42 | Row 29-30 | ESI |
| RACK | Supports 2"x 4" x 4' | 168 | Row 29-30 | ESI |

Exhibit 1.1

| RACK | Upright 12' x 4' | 8 | Row 29-30 | ESI |
|---|---|---|---|---|
| RACK | Beams 3"- 4" x 8' | 2 | Row 3-4 | ESI |
| RACK | Beams 3"- 4" x 8' | 144 | Row 3-4 | ESI |
| RACK | Decks 1/2" particle board 4x8 | 2 | Row 3-4 | ESI |
| RACK | Decks 1/2" particle board 4x8 | 72 | Row 3-4 | ESI |
| RACK | Supports 2" x 4" x 4' | 8 | Row 3-4 | ESI |
| RACK | Supports 2" x 4" x 4' | 288 | Row 3-4 | ESI |
| RACK | Upright 12' x 4' | 24 | Row 3-4 | ESI |
| RACK | Upright 8' x 4' | 2 | Row 3-4 | ESI |
| EQUIP | Table, 6' Folding top & folding legs | 1 | Row 31-32 | ESI |
| RACK | Beams 3"- 4" x 8' | 84 | Row 31-32 | ESI |
| RACK | Beams 3"- 4" x 8' | 4 | Row 31-32 | ESI |
| RACK | Decks 1/2" particle board 4x8 | 42 | Row 31-32 | ESI |
| RACK | Decks 1/2" particle board 4x8 | 2 | Row 31-32 | ESI |
| RACK | Supports 2" x 4" x 4' | 168 | Row 31-32 | ESI |
| RACK | Supports 2" x 4" x 4' | 8 | Row 31-32 | ESI |
| RACK | Upright 12' x 4' | 8 | Row 31-32 | ESI |
| RACK | Upright 8' x 4' | 2 | Row 31-32 | ESI |
| RACK | Beams 3"- 4" x 8' | 2 | Row 5-6 | ESI |
| RACK | Beams 3"- 4" x 8' | 144 | Row 5-6 | ESI |
| RACK | Decks 1/2" particle board 4x8 | 2 | Row 5-6 | ESI |
| RACK | Decks 1/2" particle board 4x8 | 72 | Row 5-6 | ESI |
| RACK | Supports 2" x 4" x 4' | 8 | Row 5-6 | ESI |
| RACK | Supports 2" x 4" x 4' | 288 | Row 5-6 | ESI |
| RACK | Upright 12' x 4' | 24 | Row 5-6 | ESI |
| RACK | Upright 8' x 4' | 2 | Row 5-6 | ESI |
| RACK | Beams 3"- 4" x 8' | 144 | Row 7-8 | ESI |
| RACK | Decks 1/2" particle board 4x8 | 72 | Row 7-8 | ESI |
| RACK | Supports 2" x 4" x 4' | 288 | Row 7-8 | ESI |
| RACK | Upright 12' x 4' | 24 | Row 7-8 | ESI |
| RACK | Beams 3"- 4" x 8' | 144 | Row 9-10 | ESI |
| RACK | Decks 1/2" particle board 4x8 | 72 | Row 9-10 | ESI |
| RACK | Supports 2" x 4" x 4' | 288 | Row 9-10 | ESI |
| RACK | Upright 12' x 4' | 24 | Row 9-10 | ESI |
| RACK | Beams 3"- 4" x 8' | 48 | Rug A | ESI |
| RACK | Decks 1/2" particle board 4x8 | 24 | Rug A | ESI |
| RACK | Supports 2" x 4" x 4' | 96 | Rug A | ESI |
| RACK | Upright 12' x 4' | 6 | Rug A | ESI |
| RACK | Beams 3"- 4" x 8' | 48 | Rug B | ESI |
| RACK | Decks 1/2" particle board 4x8 | 24 | Rug B | ESI |
| RACK | Supports 2" x 4" x 4' | 96 | Rug B | ESI |
| RACK | Upright 12' x 4' | 6 | Rug B | ESI |

Exhibit 1.1

| EQUIP | Floor Squeegies | 5 | South Wall Storage | ESI |
|-------|-----------------|---|--------------------|-----|
| EQUIP | Ladder, Extension (Aluminum) | 1 | South Wall Storage | ESI |
| EQUIP | Ladder, Werner 12' Fiberglass | 1 | South Wall Storage | ESI |
| EQUIP | Ladder, Werner 8' Fiberglass | 1 | South Wall Storage | ESI |
| EQUIP | Ladder, Wood 12' | 1 | South Wall Storage | ESI |
| EQUIP | Ladders, Werner 10' Fiberglass | 1 | South Wall Storage | ESI |
| RACK | Beams 3"- 4" x 8' | 50 | South Wall Storage | ESI |
| RACK | Beams 3"- 4" x 8' (extra) | 132 | South Wall Storage | ESI |
| RACK | Decks 1/2" particle board 4x8 | 23 | South Wall Storage | ESI |
| RACK | Upright 8' x 4' | 27 | South Wall Storage | ESI |
| EQUIP | Dolly, Raymond Pallet Jack | 2 | Staging | ESI |
| EQUIP | Lift Charger | 2 | Staging | ESI |
| EQUIP | Lift Deck, 8' Black w/Safety rails | 1 | Staging | ESI |
| EQUIP | Dolly, 2 large 4-wheel furniture | 2 | Supply Area | ESI |
| EQUIP | Dolly, Carpeted Art Cart | 1 | Supply Area | ESI |
| EQUIP | Dolly, small Milwaukee 4-wheel dolly | 1 | Supply Area | ESI |
| EQUIP | Ladder, 6' Aluminum | 1 | Supply Area | ESI |
| EQUIP | Ladder, Gorilla | 1 | Supply Area | ESI |
| EQUIP | Mover's straps, pair | 1 | Supply Area | ESI |
| EQUIP | Parts Bins w/Shelves | 2 | Supply Area | ESI |
| EQUIP | Shop-Vac, Rigid | 1 | Supply Area | ESI |
| EQUIP | Water coolers, portable | 4 | Supply Area | ESI |
| FURN | Table, 5' w/Folding legs | 2 | Supply Area | ESI |
| FURN | Table, 6' Folding top & folding legs | 2 | Supply Area | ESI |
| FURN | Table, 6' Folding w/folding legs | 1 | Supply Area | ESI |
| FURN | Table, 6' w/folding legs (white top) | 1 | Supply Area | ESI |
| FURN | Table, 8' w/Folding legs | 1 | Supply Area | ESI |
| RACK | Beams 3"- 4" x 8' | 26 | Supply Area | ESI |
| RACK | Decks 1/2" particle board 4x8 | 13 | Supply Area | ESI |
| RACK | Dolly, Blue 4-wheel cart | 1 | Supply Area | ESI |
| RACK | Dolly, Heavy-duty panel | 1 | Supply Area | ESI |
| RACK | Gondola - corrugated 2' x 2' x 4' (Delivery) | 2 | Supply Area | ESI |
| RACK | Upright 8' x 4' | 11 | Supply Area | ESI |
| APPL | Heater, heated fans | 2 | Warehouse Office | ESI |
| APPL | Water Cooler | 1 | Warehouse Office | ESI |
| FURN | Chair, misc desk chairs | 2 | Warehouse Office | ESI |
| FURN | Chair, steel stacking side chairs | 2 | Warehouse Office | ESI |
| FURN | Desk, long black laminate | 2 | Warehouse Office | ESI |
| FURN | File Cabine, black lateral | 1 | Warehouse Office | ESI |
| I/T | Brother MFC laser printer | 1 | Warehouse Office | ESI |
| I/T | Dell Computer CPU, large/old. | 1 | Warehouse Office | ESI |
| I/T | Primera Label Printer | 1 | Warehouse Office | ESI |

Exhibit 1.1

| A/V | DVD Player, Panasonic | 1 | Break Room | ?ES |
| RACK | Gondola - corrugated 2' x 1' x 4' | ? | Bed/Mattress Rack | ?ESI |
| ART | Mirror, framed | 1 | Delivery Office | ?ESI |
| EQUIP | Ladder, Kozelsky Aluminum | 1 | South Wall Storage | ?ESI |

| FURN | Chair, Herman Miller Aeron | 1 | Allan's Office | ESI |
| FURN | Mat, floor chair mat | 1 | Allan's Office | ESI |
| EQUIP | Gondola - corrugated 2' x 2' x 4' | 4 | Art Room | ESI |
| RACK | Beams 3"- 4" x 8' | 16 | Art Room | ESI |
| RACK | Decks 1/2" particle board 4x8 | 8 | Art Room | ESI |
| RACK | Supports 2" x 4" x 4' | 32 | Art Room | ESI |
| RACK | Upright 8' x 4' | 6 | Art Room | ESI |
| RACK | Beams 3"- 4" x 8' | 14 | Art Storage (Warehouse) | ESI |
| RACK | Decks 1/2" particle board 4x8 | 7 | Art Storage (Warehouse) | ESI |

Exhibit 1.1

| I/T | Primera Label Printer | 1 | Warehouse Office | ESI |
|-----|----------------------|---|------------------|-----|
| I/T | Switch, Netgear 5-port | 1 | Warehouse Office | ESI |
| FURN | Table, small draped | 1 | Women's Restroom | ESI |

**EXHIBIT 1.5**

**EXCLUDED ASSETS**

*[TO COME FROM SELLER]*

Exhibit 1.5

# EXHIBIT 2.6

## <u>PROCEEDINGS</u>

*[TO COME FROM SELLER]*

Exhibit 2.6

# EXHIBIT 2.9

## REAL PROPERTY AND PERSONAL PROPERTY LEASES

*[TO COME FROM SELLER]*

EXHIBIT 2.9

## EXHIBIT 2.15

## <u>TAX MATTERS</u>

*[TO COME FROM SELLER]*

Exhibit 2.15